Ray MARSHALL, Secretary of Labor, United States Department of Labor

v.

WOODS HOLE OCEANOGRAPHIC INSTITUTION.

Civ. A. No. 74–1306–T.

United States District Court, D. Massachusetts.

Oct. 3, 1978.

Carin A. Clauss, Sol. of Labor, Washington, D. C., Albert H. Ross, Regional Sol., and Nicholas J. Laezza, Atty., U. S. Dept. of Labor, Boston, Mass., for plaintiff.

Joseph L. Cotter and Gary L. Smith of Goodwin, Procter & Hoar, Boston, Mass., for defendant.

1. Judge of the United States Customs Court sitting by designation pursuant to 28 U.S.C. § 293(b).

2. The action was originally brought in the name of Peter J. Brennan, former Secretary of Labor; Ray Marshall, the current Secretary of Labor, has been substituted as party plaintiff for Mr. Brennan.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

MALETZ, Judge:[1]

### Findings of Fact

1. This is an action by plaintiff[2] against the defendant Woods Hole Oceanographic Institution pursuant to the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq. (hereafter referred to as the "Act") seeking (1) recovery of overtime compensation allegedly due certain specified employees of the defendant[3] for the period January 20, 1972 to March 1, 1974 and (2) an injunction to restrain the defendant from alleged violation of the Act's overtime pay provisions.[4]

2. The defendant is a non-profit, scientific research corporation, chartered under Chapter 180 of the General Laws of the Commonwealth of Massachusetts. The purpose of the Corporation, as approved by the Secretary of the Commonwealth on January 11, 1967, reads:

> To prosecute the study of oceanography in all its branches, to maintain a laboratory or laboratories, together with boats and equipment and a school for instruction in oceanography and allied subjects, and in connection therewith to confer graduate degrees and such honorary degrees as are usually conferred by colleges or universities in this Commonwealth, including joint graduate degrees conferred in conjunction with any other university, college, or institution having the authority to confer graduate degrees.

3. The defendant has the principal headquarters for its scientific activities at Woods Hole, Massachusetts. The principal activity of the defendant is oceanographic research.

3. These employees are named in Appendix A to Defendant's Exhibit A (hereafter referred to as "Appendix A").

4. Each of the following findings of fact and conclusions of law covers all the time periods relevant to this action.

4. The defendant has employees who regularly or customarily handle goods or materials which have moved in commerce. In addition, defendant has employees who send letters to points outside the Commonwealth of Massachusetts and who have telephone communications with persons outside the Commonwealth of Massachusetts.

5. The defendant has employees who engage in oceanographic experiments and research, the results of which are transmitted to persons throughout the United States.

6. The defendant has employees who conduct research, regularly prepare scientific papers, journals, and other correspondence and who engage in communications which are intended to be and are transmitted to points throughout the world.

7. Employees of defendant work on equipment that had been manufactured and/or produced outside the Commonwealth of Massachusetts.

8. The defendant owns and/or operates several research vessels for the purpose of conducting oceanographic research at sea throughout the world. The largest of these vessels, R/V Knorr, was designed and built for oceanographic research; it is 240 feet long, diesel-driven and displaces about 2,200 tons of water. The Knorr is provided to the defendant by the Office of Naval Research, United States Navy. R/V Atlantis II, also designed and built for oceanographic research, is 210 feet long, reciprocating-steam driven and displaces approximately the same amount of water as the Knorr; construction of the Atlantis II was financed in part by the National Science Foundation. The R/V Chain, a diesel-driven vessel about the same size and displacement as the Atlantis II, was built by the United States Navy as a salvage and rescue tug. When the Navy assigned the Chain to the defendant, in excess of $1 million in alterations were required to convert it to a research vessel.

Other vessels utilized for oceanographic research include the Gosnald, the Lulu and the Asterias. The Lulu is the support catamaran for the defendant's deep-diving submersible Alvin, an invaluable instrument for oceanographic research which was once utilized in connection with the recovery of a hydrogen bomb from the waters off the coast of Spain. As in the case of the Knorr and the Chain, the Alvin is provided by the Office of Naval Research for the defendant's use.

9. (a) A significant portion of the defendant's research activity occurs aboard its research vessels. The oceanographic research vessels owned and/or operated by the defendant are sophisticated, integrated research tools whose only purpose is to conduct scientific investigations and experiments at sea. They were designed and built or converted for that purpose, and are so specialized that they have no other practical functions or capabilities.

(b) Certain basic equipment is installed permanently on the vessels. This equipment, which is common to most oceanographic research, includes: winches capable of lowering instruments deep into the water; very sophisticated computer installations and precise navigation equipment for accurate maintenance of the vessel's position at sea; sound transducers for research conducted with underwater sound; special electrical features needed because of the large power requirements of the winches and special voltage frequency and power requirements of the other scientific equipment; and air-conditioning because much of the electronic equipment must operate under stringent temperature controls.

(c) In addition to the equipment permanently fixed on the vessels, there is extensive laboratory space for installation of special instrumentation and equipment which is brought on board for particular missions. For example, in the fall of 1972, the Chain was located between Woods Hole, Massachusetts and Bermuda to study acoustic transmissions of sound through the ocean. A hydrophone, which is an underwater microphone, moorings, a very large tape recorder and racks of other equipment were loaded onto the Chain, secured and then unloaded when the cruise was completed. When the vessel's mission is biological, nets, trawls or a plankton tow are brought

aboard. Physical science and geological missions require water sampling equipment, buoys, instruments to measure water temperature and salinity, coring devices and water trawls.

10. The personnel on the vessels consist of the scientific party and ship's crew, all of whom contribute their work to the accomplishment of the vessel's scientific mission. The scientific party on board a research vessel is headed by a scientist, designated the Chief Scientist, who is in overall charge of the cruise and is the on-the-scene representative of the management of the defendant. As such, the Chief Scientist has the responsibility, and is delegated the necessary authority, to carry out the research programs efficiently and effectively. His function is to coordinate and manage the employees, all to the end of achieving the scientific mission of the vessel. Although there may be only one scientific program on a cruise, more often there are from two to six programs. The remaining scientists in a vessel's scientific party come within the following categories:

Assistant Scientist is an individual who (a) holds a Ph.D. degree and has sufficient experience to do independent research or (b) regardless of degrees held has demonstrated ability to conduct independent research of high quality. The post is probationary in that it provides that individual with an opportunity for professional development as an oceanographer and also provides the defendant an opportunity to evaluate the individual's promise as a continuing member of the Resident Scientific Staff.

Associate Scientist is an individual who has demonstrated the qualities expected of a mature, and independent research scientist including the capacity to identify significant research questions, the ability to formulate and carry out research to answer these questions, the ability to exercise judgment and discrimination in the interpretation of research results, and the motivation to present the results of this research to the judgment of others through lectures, publications and papers.

Senior Scientist is an individual who has shown continued excellence in scientific research and who through significant original contributions has gained an international reputation. He is responsible not only for initiating and conducting independent research, but is expected through example, influence and advice to promote the attainment of the highest scientific standards within the defendant.

Research Associate is an individual who has demonstrated superior professional competence in conducting design, field and laboratory work. His qualifications include (a) the necessary training and experience to be expected to discharge varied and demanding professional assignments with a minimum of supervision; and (b) a demonstrated motivation for the continued renewal and development of his professional skills.

Research Specialist is an individual who has demonstrated unusual ability in applying professional skills to engineering or scientific problems. He has a record of superior accomplishment such as patents, publications or documented instrumentation which provides objective evidence of original professional contributions.

Senior Research Specialist is an individual who has demonstrated unusual originality and professional accomplishment. He has made significant contributions to the advancement of his profession, or has made technical contributions which have significantly advanced the science of oceanography.

Visiting Investigator is a scientist whose normal employment is with another institution, but who is a temporary employee of the defendant. He performs the duties of an Assistant, Associate or Senior Scientist while affiliated with the defendant.

Post-Doctoral Investigator is a scientist who has received his doctorate degree recently and is beginning his career as a research scientist. The period of appointment is for one year and may be renewed for one additional year.

The persons described above, while at sea, continue to apply their intellectual and professional capacities to the accomplishment of the scientific research programs being undertaken. They provide the scientific leadership and management to the project.

11. The defendant employed each of the persons named in Appendix A during the period of employment as shown therein at various times between January 1972 and March 1974, in and about its research laboratories in Woods Hole and on oceanographic research vessels, in various capacities. On research cruises, they were employed by defendant onboard its oceanographic research vessels throughout the world, as departmental assistants, laboratory assistants, research assistants, and senior research assistants, to provide the support to carry out the routine tasks in order to permit the scientists and technicians to devote their efforts to interpretation, research, and analysis.

12. The employees named in Appendix A, while aboard defendant's oceanographic research vessels, were part of the vessel's scientific crew.

13. The duties at sea of the employees named in Appendix A included navigation, depth finding, seismic profiling, water sampling, repair and maintenance of electrical and electronic equipment, operation of computers and obtaining of marine specimens, as more specifically described below.

*Navigation*—It is a requirement of oceanographic research that the location of the vessel be known as precisely as possible at all times. The accuracy required is far more precise than that of vessels engaged in transport. To attain the necessary precision the research vessels carry satellite navigation systems, short and long range parabolic electromagnetic systems (OMEGA and LORAN C) and precise relative motion systems. These several elements are integrated into a navigation system and the output is used to determine the movements which are required of the ship. Members of the scientific party including some persons of the kind named in Appendix A operate these navigation systems.

*Depth finding*—Sound transducers are built into the hulls of the research vessels. These transducers emit acoustic energy into the water and in return receive an echo from the ocean bottom. The ocean's depth is measured by the elapsed time, and is portrayed visually on a "precision graphic recorder" or "precision depth recorder" which is connected electrically to the transducers. This information is used to determine the vessel's movements and provides scientific data and a refinement on the location of the ship which is used to avoid shallow water. This equipment is operated by the kinds of employees named in Appendix A.

*Seismic profiling*—Of prime interest to the geologist and geophysicist is the nature of the ocean bottom, which consists of layers or strata of diverse material that have accumulated during the world's geological history. One method of determining the nature of the ocean bottom is by seismic profiling. Large amounts of acoustic energy are emitted into the water by means of explosive charges, the collapse of a bubble formed in the water by high pressure air, or a high voltage spark. The echoes are received by hydrophones towed astern of the ship, and the information is processed on the precision graphic recorder. Employees of the kind named in Appendix A prepare and launch the hydrophone arrays, using the vessel's cranes, winches, A-frames, and lines; they also operate the noise-making apparatus and the receiving equipment.

*Water characteristics*—The characteristics of the water are determined either by taking actual samples for analyses of chemical constituents, or by sensors which measure and determine the temperature and salinity. If the former method is utilized, containers of varying designs are lowered and recovered by attaching them to wires and cables from the vessel's winches. In the latter case, the sensors also are attached to wires, lowered and recovered, and the information recorded electrically on shipboard in-

struments. This entire operation, including the preparation of the containers or sensors and the lowering, raising and recovery is done by employees of the kind named in Appendix A.

*Repair and maintenance of equipment* —The scientific party includes artisans skilled in the repair and maintenance of instruments, especially electrical and electronic instruments. These persons work both on "scientific" equipment and "vessel" equipment as the need arises. They are required particularly in the areas of radio equipment, radar, steering controls and intercommunications equipment.

*Marine specimens*—When a research vessel is on a biological mission, it often obtains samples of living specimens from the oceans. Techniques for obtaining such specimens include (a) bottom trawls analagous to those used by the fishing industry for flounder, (b) midwater trawls similar to those used for cod and haddock, (c) bottom dredges analagous to those used for clams, (d) specialized nets for plankton and other minute animals and (e) baited hooks for tuna and dolphins. Employees of the kind named in Appendix A prepare these devices, launch them and recover them.

*Computers*—Each of the vessels carries a computer which is used both for scientific purposes and for navigation. The computer is operated by employees of the kind named in Appendix A.

14. While at sea on research cruises, the employees named in Appendix A worked irregular hours. Thus, a research assistant on a biological cruise whose primary duties involved analysis of water samples began to work whenever sampling stations were scheduled; her work concluded at different times. Another research assistant's primary duties on board the *Chain* were to load, secure and unload the scientific equipment and stand watch to make sure that such equipment didn't break and that its operation continued in a normal fashion. He wrote the first draft of his master's thesis, did a lot of reading in the vessel's library and sunned himself on the vessel's deck. For approximately one week out of the four weeks of the cruise, he stood a watch, four hours on and eight hours off, to make sure that the amplifiers used in the ambient noise experiments operated satisfactorily.

15. From January 1972 until March 1974, the defendant paid the employees named in Appendix A on the basis of a 40-hour week for Monday through Friday. For each Saturday, Sunday and holiday at sea, the defendant credited them with one day of "cruise leave." The employee could either take these days off as compensatory time during a normal work week over the course of the ensuing twelve months or receive the value of these days in cash upon completion of the cruise. The net effect is that these employees received 56 hours of straight-time pay for each week at sea.

16. On or about the date of filing of the complaint in this action on April 10, 1974, although denying applicability of the Act to itself and the employees named in Appendix A, the defendant changed its practice in regard to compensation of these employees whose rate of overtime pay is at issue. Therefore, since the spring of 1974 the defendant has paid these employees for overtime worked on research cruises as though the overtime provisions of the Act apply to their employment.

17. In addition to the employees named in Appendix A, defendant, while at sea, employed the following employees in the operation of its vessels: Master, Chief Mate, Second Mate, Third Mate, Bosun, Able Bodied Seamen, Ordinary Seamen, Chief Engineer, First Assistant Engineer, Second Assistant Engineer, Third Assistant Engineer, Oiler, Junior Oiler, Wiper, Firemen, Steward, Cook, Galleyhand, Messmen, Radio Officer, Medical Corpsmen/Officers, Deck Engineer, Electrician, and Cadet, as more specifically described below:

*Master*—under general direction of the management of the defendant and of the Chief Scientist has charge of the navigation, safe operation, care and maintenance of the vessel. Is available throughout the day and night for call as required.

Has authority for discipline of all on board.

*Chief Mate*—assists the Master in the navigation and operation of the vessel. Succeeds the Master in event of disability. Stands a deck watch at sea. Supervises the maintenance activity of the non-engineering part of the ship. Maintains personnel records of persons on the vessel.

*Second Mate*—assists the Master in the navigation and operation of the vessel. Stands a deck watch at sea. Maintains the nautical charts. Supervises the keeping of the ship's log.

*Third Mate*—assists the Master in the navigation and operation of the vessel. Stands a deck watch at sea.

*Bosun*—supervises unlicensed deck personnel when they are engaged in maintenance and repair activities. Provides for the operation and maintenance of boats, anchors, cordage, running and standing rigging.

*Able Bodied Seaman* (Dayman)—performs a variety of duties involved in the maintenance and repair of deck equipment. Chips, scrapes, and paints fixtures, decks, superstructure and sides of the vessel. Stands watch on bridge as a helmsman. An AB who is assigned full-time to repair and maintenance is termed a Dayman.

*Ordinary Seaman*—performs a variety of duties as assigned in the maintenance of and repair to deck equipment. Chips, scrapes, and paints decks, superstructure and sides of the vessel. Stands watches on the wing of the bridge or in the eyes of the vessel as a lookout.

*Chief Engineer*—supervises the operation, maintenance and repair of the main engines, the electrical system and auxiliary machinery. He is available as required twenty-four hours per day.

*First Assistant Engineer*—assists the Chief Engineer in the operation, maintenance and repair of the main engines, the electrical system, and auxiliary machinery. Stands watch as an engineering officer-of-the-watch when at sea. Replaces

the Chief Engineer should that person become incapacitated.

*Second Assistant Engineer*—assists the Chief Engineer in the operation, maintenance and repair of the main engines, the electrical system and auxiliary machinery. Stands watch as an engineering-officer-of-the-watch at sea.

*Third Assistant Engineer*—assists the Chief Engineer in the operation, maintenance and repair of the main engines, the electrical system and auxiliary machinery. Stands watch as an engineering-officer-of-the-watch at sea.

*Oiler*—performs maintenance and repair work on main engines, auxiliaries and electric motors under the supervision of the Chief Engineer. Stands a watch in the engine room at sea, taking gauge readings, lubricating bearings, operating various valves and controls.

*Junior Oiler*—performs duties of oiler. This is an entry grade sometimes used for less experienced personnel.

*Wiper*—cleans machinery and engine room equipment. Assists in repair and maintenance. Stands watch in engine room at sea, cleaning, chipping and painting, acts as messenger.

*Fireman*—performs maintenance and repair work on marine boilers. Stands watch in the boiler room at sea and in port. Adjusts flow of fuel to the boiler burners and admits feed water to boiler to meet the requirements for power.

*Steward*—supervises and participates in the requisition, inspection, storage, preparation of food. Schedules and assigns work in the preparation of food, cleaning of galley, and messrooms.

*Cook*—under the supervision of the Steward is responsible for the operation and maintenance of the galley. Prepares and cooks food.

*Galley/Utility*—assists the Cook in the preparation of food. Cleans galley. Washes dishes and pots and pans.

*Messman*—keeps messroom and passages in living quarters clean. Serves meals in messrooms. Washes dishes.

*Radio Officer*—operates the radio communication equipment, and maintains it.

*Medical Officer or Corpsman*—an individual who has first aid and nurse training. Has charge of the sick bay. Issues medicine and cares for the sick. Obtains medical advice by radio for serious cases. When a medical corpsman is not assigned the Chief Mate is in charge of the sick.

*Deck Engineer*—a mechanically skilled person who maintains and repairs auxiliary machinery such as winches, capstans, cranes. Normally does not stand a watch.

*Electrician*—an electrically skilled person who maintains and repairs electric motors and electric motor control equipment. Normally does not stand a watch.

*Cadet*—on rare occasions a student at one of the maritime academies is taken on board in the status of a trainee, either deck or engineer, to gain experience. They are not employees of the defendant.

18. The employees named in Appendix A never performed any duties at sea in the engineroom of the ship, on the bridge, in the wheelroom or on deck. Nor did these employees perform any duties relating to the ship's communication equipment, the radar, sonar, or the signaling equipment. Further, these employees did not maintain, repair or clean the ship's equipment aside from having the responsibility of keeping their own rooms clean. Neither the Master nor any of his subordinates directed any of the work performed by these employees; rather their work activity was directed by a member of the scientific party.

19. The employees named in Appendix A used the ship's cranes which were operated by a member of the crew. They assisted the ship's crew in loading the scientific equipment aboard the vessels; moved the equipment after it had been loaded; and participated in unloading it at the conclusion of the cruise. Bottles for water sampling were put over the side of the vessel by the employees named in Appendix A by means of wires attached to the winch, which was operated by a seaman. The employees stood watch (1) to make sure that the scientific gear didn't break and operated in a normal fashion; (2) to keep an eye

on the gravity meter, which recorded data on the measurements of the earth's gravity; and (3) to make sure that the amplifiers were working properly. The employees also worked with an anchor, shackles, bolts and cables in preparing and retrieving a mooring which was described as follows:

A mooring is a scientific instrument of some sort in a pressure case to protect it from water and extreme pressure that has some flotation attached to it. It also had a thing called a release, and at the bottom an anchor. The purpose of the release is to let go the anchor at the end of the experimental period so you can get the device back and load it on board the vessel.

On occasion, members of the scientific party and others at dockside, as an accommodation, assisted the crew in handling the lines for the purpose of entering and leaving port and in deploying the gangway. Members of the scientific party also launched transducers, operated the *Alvin* (which, as set out in finding 8, is a deep-diving submersible that is an invaluable instrument for oceanographic research), and prepared for trawling.

20. There was a considerable amount of cooperation between the employees named in Appendix A and the crew, all of whom worked together and contributed to the accomplishment of the vessel's mission. Thus, they maintained and repaired the gyroscopes and utilized the satellite navigation system and depth finders. They also worked together in connection with retrieval of moorings.

21. The defendant provides for a program of education beyond the high school level in that it conducts a school offering educational programs leading to the doctoral degree, Ph.D., and programs for students who have already received their Ph.D. degree. It does not offer a bachelor's degree or the intermediate master's degree. In its approval of the defendant's educational programs on November 1, 1967, the Board of Higher Education of the Commonwealth of Massachusetts included only the authority to confer "graduate" degrees. A bache-

lor's degree or its equivalent in a science program, or equivalent experience, is a requirement for admission to a degree program.

22. The defendant conducts a summer student fellowship program for undergraduate and graduate students.

23. More specifically, the defendant conducts the following educational programs:

GRADUATE DEGREE PROGRAM

*The W.H.O.I.—M.I.T. Joint Programs*

The Woods Hole Oceanographic Institution, in partnership with the Massachusetts Institute of Technology, offers programs of study leading to a single doctoral degree, awarded jointly and simultaneously by both institutions.

In the program leading to the degree of *Doctor of Philosophy* or *Doctor of Science in Oceanography,* study may concentrate in one or more of the following areas: Biological Oceanography, Chemical Oceanography, Marine Geology, Marine Geophysics, or Physical Oceanography.

In the program leading to the degree of *Doctor of Philosophy in Ocean Engineering,* study and research concentrates on those areas of ocean engineering required for the advancement of the ocean sciences.

In the program leading to the degree of Ocean Engineer (professional degree), there is a minimum of three years of intensive academic study and research. Students are expected to complete satisfactorily a basic curriculum in ocean science and ocean engineering subjects. A thesis is required.

*The Woods Hole Degree Program*

Programs of study and research leading to the degree of *Doctor of Philosophy in Oceanography,* awarded by the Woods Hole Oceanographic Institution.

SPECIAL STUDY AND TRAINING PROGRAMS

*Postdoctoral Fellowship Awards in Ocean Study*

One-year investigatorship awards are made annually on a competitive basis to recent recipients of Ph.D. degrees.

Applications are accepted from doctorates in the physical and biological sciences who wish to become acquainted with oceanography, and also from new Ph.D. graduates in oceanography or ocean engineering who wish to broaden their training and experience.

*Summer Student Fellowships*

A special fellowship program is operated during the summer to acquaint outstanding young advanced undergraduates and beginning graduate students with ocean studies. These are familiarization fellowships and no formal instruction is conducted.

*Summer Study in Geophysical Fluid Dynamics*

A ten-week research and study program is conducted each summer. Invited staff members and students work together on the formation and exploration of tractable research problems related to geophysical fluid dynamics. Student participants in this program are selected from both doctoral candidates and postdoctoral applicants, and receive summer fellowships.

*Marine Policy and Ocean Management Program*

A limited number of fellowships are available to doctoral candidates and recent doctoral recipients of special competence in such areas as law, political science, economics, management, and foreign affairs to undertake advanced studies in marine science affairs.

24. The defendant has awarded 70 degrees, including 11 Professional Degrees[5] and 59 Ph.D. degrees in conjunction with M.I.T., and one Ph.D. degree on its own.

25. The defendant is not accredited as an educational institution by the United States Department of Health, Education and Welfare.

---

5. The Professional Degree thus awarded is the Degree of Ocean Engineer and is between a Master's and Doctor's Degree.

718

26. For the years 1972 and 1973, the defendant received from governmental and non-governmental sources funds in the amounts of $12,285,046 and $12,863,373, respectively, for its basic oceanographic research activities.

27. During the years 1972 and 1973, the defendant engaged in the performance of contracts with the United States Navy for oceanographic research.

28. Since September 17, 1970, the defendant has been engaged in the performance of Navy Contract No. N00014–71–C–0057. This is a Cost-Plus-Fixed-Fee contract providing for, through Modification No. P00011, an estimated cost of $3,046,585.00 and a fixed fee of $64,503.00. Under this contract, the defendant is required to conduct investigations of the acoustics of oceanic noise and to provide reports for the United States Navy.

29. Since September 1, 1972, the defendant has been engaged in the performance of Navy Contract No. N00014–73–C–0097. This is a Cost-Plus-Fixed-Fee contract providing for, through Modification No. P00004, an estimated cost of $431,162.00 and a fixed fee of $11,338.00. Under this contract, the defendant is required to provide the necessary personnel to conduct deep ocean research and engineering through operation of the *Alvin* and to furnish reports to the United States Navy. The *Alvin,* as previously indicated, is a deep diving submersible designed for oceanographic research.

30. The contracts and modifications thereto were awarded in accordance with law in effect at the time of the awards and modifications; the contracts and modifications thereto contain the standard government provisions applicable at the time of the awards and modifications.

### Conclusions of Law

1. This court has jurisdiction over the parties and the subject matter of this action under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq.

2. Defendant is a non-profit, scientific research corporation organized under and existing by virtue of the laws of the Commonwealth of Massachusetts, having its principal office at Woods Hole, Massachusetts, within the jurisdiction of this court, and is engaged at that place and elsewhere in the operation of a research and educational institute.

3. Defendant is an employer engaged in commerce or in the production of goods for commerce within the meaning of section 3 of the Act, 29 U.S.C. § 203.

4. (a) Under section 3(r) of the Act (29 U.S.C. § 203(r)), activities of non-profit organizations (such as the defendant) organized to further research and education are performed for a business purpose where such organizations engage in ordinary commercial activities. In such cases, the business activities are treated under section 3(r) of the Act the same as when they are performed by the ordinary business. *Mitchell v. Pilgrim Holiness Church Corp.,* 210 F.2d 879 (7th Cir. 1954), *cert. den.* 347 U.S. 1013, 74 S.Ct. 867, 98 L.Ed. 1136 (1954). See also, e. g., S.Rep.No.145, 2 U.S.Code Cong. & Admin.News, pp. 1620, 1660 (1961); *Wirtz v. First National Bank & Trust Co.,* 365 F.2d 641, 644 (10th Cir. 1966); *Wirtz v. Columbian Mutual Life Insurance Co.,* 380 F.2d 903, 907 (6th Cir. 1967).

(b) Defendant engages in ordinary commercial activities since it contracts with the United States Navy under the same terms and conditions as any other commercial organization in the United States. See finding of facts 28–30, *supra.* See also 32 C.F.R. 15–201 et seq. (1975).

(c) In view of the foregoing, defendant is engaged in activities which are related and performed through unified operation or common control for a common business purpose, thus constituting an enterprise within the meaning of section 3(r) of the Act, 29 U.S.C. § 203(r).

5. The enterprise has an annual gross volume of business done of not less than $250,000 (exclusive of excise taxes at the retail level which are separately stated).

Therefore, the enterprise is an enterprise engaged in commerce or in the production of goods for commerce within the meaning of section 3(s)(1) of the Act, 29 U.S.C. § 203(s)(1).

6. The enterprise has many employees engaged in commerce or the production of goods for commerce, including employees handling or otherwise working on goods that have been moved in or produced for commerce by any person, and by reason of such employment activities is engaged in the business of oceanographic research and related activities. Therefore, the enterprise is engaged in commerce or in the production of goods for commerce within the meaning of section 3(s)(1) of the Act, 29 U.S.C. § 203(s)(1). See 29 C.F.R. 776.20 (1976); Anno. *Fair Labor Standards Act—Goods,* 7 ALR Fed. 155 (1971).

■ 7. (a) The enterprise is also engaged in the operation of an institution of higher education within the meaning of section 3(s)(5) of the Act, 29 U.S.C. § 203(s)(5). Therefore, the enterprise is an enterprise engaged in commerce or in the production of goods for commerce within the meaning of that section.

(b) An institution of higher education within the meaning of section 3(s)(5) of the Act is an institution such as a college, university, junior college, a professional school of engineering, law, etc. which (1) admits as regular students only individuals having a certificate of graduation from a high school or the recognized equivalent of such a certificate; (2) is legally authorized to provide a program of education beyond high school; and (3) provides an educational program for which it awards a bachelor's or higher degree, or provides a program which is acceptable for full credit toward such a degree, or offers a program of training to prepare students for gainful employment in a recognized occupation. See 26 U.S.C. § 3309(d); United States Department of Labor, *Institutions of Higher Education under the Fair Labor Standards Act,* WH Publication 1317 (Rev.1973) pp. 1–2.

(c) "[P]ersons working under the auspices of * * * [an institution of higher edu-

cation] at experimental or research stations located away from the campus would not be considered as being covered under the Act, provided no instruction is given and no students are present at the stations. Such experimental activities are not considered a continuation, or extension of the academic program of the school." *Institutions of Higher Education under the Fair Labor Standards Act, supra,* pp. 2–3.

■ (d) The activities of the employees of defendant named in Appendix A were not actually performed "in connection with" the operation of an institution of higher education within the meaning of section 3(r)(1) of the Act, 29 U.S.C. § 203(r)(1).

■ 8. (a) The exemptions provided in the Act are to be narrowly construed against the employer seeking to assert them and their application is limited to those who come plainly and unmistakably within their terms and spirit. *A. H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945); *Mitchell v. Kentucky Finance Co.,* 359 U.S. 290, 295, 79 S.Ct. 756, 3 L.Ed.2d 815 (1959); *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960).

■ (b) The employees of the defendant named in Appendix A were not employed as seamen within the meaning of section 13(b)(6) of the Act, 29 U.S.C. § 213(b)(6). Therefore, the exemption for seamen provided by that section is not applicable. See, e. g., *Walling v. Bay State Dredging & Contracting Co.,* 149 F.2d 346 (1st Cir. 1945), *cert. den.* 326 U.S. 760, 66 S.Ct. 140, 90 L.Ed. 457 (1945); *Godfrey v. United States,* 248 F.Supp. 273 (S.D.Cal.1965); *Sennett v. Shell Oil Company,* 325 F.Supp. 1 (E.D.La.1971); *Bennett v. Perini Corporation,* 510 F.2d 114 (1st Cir. 1975); *Sternberg Dredging Co. v. Walling,* 158 F.2d 678 (8th Cir. 1946); *Offshore Company v. Robison,* 266 F.2d 769 (5th Cir. 1959); 29 C.F.R. 783.31–783.34 (1976).

*Ultimate Conclusions of Law*

■ 1. Defendant has violated the provisions of sections 7 and 15(a)(2) of the Act

(29 U.S.C. §§ 207 and 215(a)(2)) by employing the employees named in Appendix A in commerce and in the production of goods for commerce, for workweeks longer than 40 hours without compensating such employees for their employment in excess of 40 hours, in workweeks during the period from January 20, 1972 to March 1, 1974, at rates not less than one and one-half times their regular rate of pay.

2. Plaintiff is entitled (1) to recover overtime compensation due the employees of the defendant named in Appendix A for the period January 20, 1972 to March 1, 1974; and (2) to an injunction to restrain the defendant from violation of the Act's overtime pay provisions. Pursuant to rule 58 of the Federal Rules of Civil Procedure, the court directs that the attorneys for the parties shall agree upon and submit within 15 days a proposed form of judgment.